IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03396-MEH

VINCENT G. ABEYTA,

    Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

    Defendant.

_____

# ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge**.

    Plaintiff, Vincent G. Abeyta, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and his application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **affirms** the ALJ's decision and Commissioner's final order.

## BACKGROUND

**I.    Procedural History**

    Plaintiff seeks judicial review of the Commissioner's decision denying his applications for

DIB and SSI benefits filed on December 8, 2010 and November 18, 2010, respectively. [AR 38-41, 639-655]   After the applications were initially denied on May 24, 2011 [AR 29-31], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for April 19, 2012 [AR 76-81]. Plaintiff and a vocational expert testified at the hearing. [AR 451-478] The ALJ issued a written ruling on May 21, 2012 finding Plaintiff was not disabled since November 1, 2009, because considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs existing in significant numbers in the national economy that Plaintiff could perform. [AR 14-31]  The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review [AR 5-8]. *See* 20 C.F.R. § 416.1481.

Plaintiff filed a complaint in this district in Civil Action No. 13-cv-1659-JLK on June 15, 2013; however, on March 21, 2014, Judge Kane granted the Commissioner's motion to remand the matter to the SSA.  Thereafter, the Appeals Council vacated the ALJ's decision and remanded the matter to the ALJ to hold a hearing regarding the following: (1) consider *both* the Title II and Title XVI applications; (2) utilize the "special technique" in analyzing Plaintiff's mental impairments; and (3) further consider the severity of Plaintiff's glaucoma and hearing loss. [AR 531-532] The ALJ scheduled the second hearing for November 12, 2014. [AR 551-556]  Plaintiff and a vocational expert testified at the hearing. [AR 681-714] The ALJ issued a written ruling on November 21, 2014 finding again the Plaintiff was not disabled since November 1, 2009, because considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  [AR 479-494]  Plaintiff

timely filed his complaint with this Court seeking review of the ALJ/Commissioner's final decision.

## II.     Plaintiff's Alleged Conditions

Plaintiff was born on March 14, 1968; he was 42 years old when he filed his applications for DIB and SSI benefits in November and December 2010. [AR 209-224] Plaintiff claims he became disabled on November 1, 2009 and reported that he was limited in his ability to work by "injury to both legs, head injury, right foot injury, hearing loss in right ear, glaucoma, depression, and back injury." [AR 495]

With respect to his hearing loss, Plaintiff noticed it suddenly on August 25, 2004 while working on constructing a roof. [AR 202] Charlene Hickson, M.D. examined and tested the Plaintiff annually in 2004 and 2005, and assessed him with "asymmetric sensorineural hearing loss, etiology most consistent with a viral syndrome." [AR 200-203] Julie Newberg, M.D. then examined Plaintiff in 2008 and noted his MRI tests were "normal" and prescribed ten days of prednisone. [AR 198-199] The hearing loss in Plaintiff's right ear improved "slightly." [*Id.*]

Although mostly illegible, medical records from 2008 indicate James Fowler M.D. of Abba Eye Care "suspected" Plaintiff had glaucoma and referred him to a specialist. [AR 206-210] Thereafter, on May 3, 2011, Eric Blom M.D. of Rocky Mountain Eye Center examined and tested Plaintiff and found he had "end stage glaucoma, retinal disorder, nos, and myopia," and characterized the glaucoma as "vision threatening." [AR 402-406] Plaintiff reported to Dr. Blom that he was "unable to afford drops or exams" and the doctor responded, "without treatment [Plaintiff] understands this condition will inevitably progress to blindness." [AR 409]

The first medical record concerning Plaintiff's leg pain is dated December 15, 2009 when

he presented to the Parkview Emergency Department for "acute exacerbation of chronic leg pain"; Plaintiff was prescribed Percocet and Motrin for pain and released. [AR 234-235] On July 8, 2010, another health care provider reported the Plaintiff "states that he has recovered from [a right broken leg, dislocated shoulder and facial fractures from 2001 accident] with the exception of right lower extremity weakness compared to the left, as well as the right lower extremity falling asleep if he sits too long." [AR 317] X-rays of the Plaintiff's right knee, right tibia and fibula on July 12, 2013 reveal only "postsurgical findings" and "no acute disease." [AR 611, 615]

Plaintiff first injured his back on July 5, 2010 when he attempted to lift and open the main gate at his place of employment. [AR 326-327] The workers' compensation physician, J. Douglas Bradley, M.D. assessed Plaintiff with myofacial strains in the lumbar and cervical areas of his back and in his right shoulder, and prescribed pain medications and physical therapy for two weeks. [*Id.*] By July 13, 2010, the shoulder and cervical strains resolved [AR 312], and his back pain slowly improved, then stabilized by September 17, 2010 [AR 248-249]. A functional capacity evaluation on September 9, 2010 showed a 7% loss of motion impairment and a 12% whole person impairment; Dr. Bradley found Plaintiff could lift and carry no more than 20 pounds. [AR 244-245]

Plaintiff presented to Thurman Hodge, D.O. for a consultative physical examination on April 27, 2011. [AR 393-398] After a thorough examination, Dr. Hodge found Plaintiff could sit, stand and walk for eight hours in an 8-hour workday, perform other postural actions, and lift and carry 40 pounds. [AR 397]

Plaintiff injured his back again on July 11, 2013 when he tripped over a hose and fell at work. [AR 619] Dr. Bradley referred Plaintiff for eight chiropractic treatments starting August 8,

2013; Plaintiff improved only "slightly" to a pain scale of 6 out of 10, and the physician found "further chiro care is unlikely to provide any additional benefit." [AR 619-622] On September 10, 2013, Dr. Bradley ordered an MRI of Plaintiff's lumbar spine; the radiologist found Plaintiff had "L5-S1 disc desiccation, disc space narrowing, shallow left-sided disc herniation and disc bulging with slight displacement of the left S1 nerve." [AR 616] Dr. Bradley then referred Plaintiff to a musculoskeletal specialist, who assessed Plaintiff with "bilateral sacroiliitis, chronic L4-5 right sensory motor disturbance, and L5/S1 left herniated nucleus pulposus," and ordered bilateral sacroiliac injections, then physical therapy. [AR 608-610]

Plaintiff's depression is first mentioned in the record in July 2009 when he started counseling at the Southern Colorado Family Medical Center. [AR 212-219] He was referred to Spanish Peaks Mental Health Center by the Pueblo County Department of Social Services (DSS) on February 3, 2010 for treatment with "hopes of regaining custody of his [15-year-old] daughter." [AR 379] NP Veronical Sandoval at SPMHC conducted a "psychiatric evaluation" on March 12, 2010, diagnosed Plaintiff with depressive disorder, nos, and assessed a Global Assessment of Functioning (GAF) score of 68.[1] [AR 427-428; 435] He continued therapy and treatment with SPMHC through August

---

[1] In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally

18, 2011 at which time his diagnosis was updated to "depressive disorder, nos, parent/child relational problem, partner relational problem, cannabis abuse, alcohol abuse, and anxiety disorder, nos" and a GAF score of 65. [AR 419-420] The reason given for discharge was: "Vincent's progress was plodding, he was not completing his homework, was argumentative toward his case worker and would not follow through with his therapy sessions and was either not showing up or

---

satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

rescheduling several of his appointments." [AR 419]

Meanwhile, Plaintiff presented to Brett Vallette, PhD, for a consultative psychological examination on March 30, 2011. [AR 389-392]  Dr. Vallette diagnosed Plaintiff with "major depression, alcohol abuse, and rule out nonspecific cognitive disorder," and assessed a GAF score of 45-50. [AR 391]

As a result of Plaintiff's July 11, 2013 back injury, Dr. Bradley referred Plaintiff to James Evans, PhD, on September 13, 2013 for "psychological evaluation and treatment." [AR 635].  That day, Dr. Evans assessed Plaintiff with severe depression, but by September 18, 2013, Dr. Evans noted Plaintiff was "less depressed" and assessed him with "intractable pain, reactive depression, fear and anxiety." [AR 634-636] Dr. Evans noted on October 2, 2013 that Plaintiff was working "40+ hours per week" [AR 633], but on October 16, 2013, Plaintiff reported that he had been laid off for inability to accommodate his restrictions [AR 632].  According to the record, Dr. Evans treated Plaintiff through November 20, 2013 under the same diagnosis. [AR 628]

### III.     Hearing Testimony

At the hearing on April 19, 2012, the Plaintiff, his counsel, and vocational expert Dennis Duffin appeared. [AR 451-478] The Plaintiff testified that the impairments most limiting his ability to work were his "right leg," his hearing loss, his memory loss, and his glaucoma; he worked as a "car detailer" only three hours per week due to his employer's limitations based on his physical health; he stated he could work more than three hours based on his physical limitations in an office job, but he could not perform an office job because of stress and anxiety attacks; he was getting food stamps and donated plasma twice a week to pay expenses; he drank only occasionally and had not

used marijuana since high school; he had his physical and mental impairments before November 1, 2009, but they got worse after his work injury in July 2010; he could sit for 20 minutes, stand for 30 minutes, could walk a block and rest for a total of two hours, and could lift and carry 20 pounds; he pushed the cart at the grocery store for 30-45 minutes while his wife loaded the cart; he had trouble hearing in crowded, public places, but could hear in quiet places; and his vision was blurry both at distance and close up, but he could drive during the day.[2] [AR 454-474]

At the second hearing on November 12, 2014, the Plaintiff, his counsel, and vocational expert Dennis Duffin appeared. [AR 681-714] The Plaintiff testified only as to the "changes" he had experienced since the last hearing: his vision had gotten "more blurry" in seeing up close; depression had gotten worse since he stopped working in 2013; he spent a lot of time alone and felt sad more often; his back and leg pain were two separate problems; he had leg pain for 13 years and the back pain started in 2008 when he began detailing cars; because of back pain, he could not sit, stand or lie down for long periods; slept "when pain allows"; he could not lift more than 10 pounds due to increased pain; he had "drop foot" in his right foot, which then caused stumbling/tripping and pain in his left leg; he was wearing a splint on his left wrist from a recent "assault"; a test revealed he could hear nothing in his right ear; before stopping work in 2013, he worked six hours per day, but injured his back tripping over a hose; he tried to go back to work, but pain made it too difficult; the employer told him that if he could not work the necessary six hours, they would have to find someone else; he could no longer sit for 20 minutes or stand for 30 minutes; he was "always up and

---

[2]Because the Appeals Council vacated the ALJ's May 21, 2012 decision, which was based in part on the vocational expert's testimony at the April 19, 2012 hearing, the Court will consider neither the expert's testimony nor the decision from 2012.

down" to relieve the back pain; his pain and moving around caused him to lose concentration and focus; and his depression got worse after an incident involving his daughter six years previously. [AR 684-707]

Mr. Duffin testified that an individual with Plaintiff's age, experience and education – limited to an exertional level and full range of sedentary, non-exertional limitations; occasional squat, kneel, and crawl; no ladders or scaffolds; no foot or leg controls; frequent but not constant acute visual acuity, and no complex tasks defined as SVP 2 or less – could perform the jobs of document preparer or scanner, call-out operator, and lens block gager. [AR 708-710] He also testified that Plaintiff could perform the job of surveillance system monitor. [AR 710] He affirmed that the jobs could be performed sitting or standing. [AR 712-713] Finally, Mr. Duffin stated that leaving work early by 90 minutes three times per week and unscheduled 15-minute breaks every day would not be acceptable at most competitive jobs. [711-712]

The ALJ issued an unfavorable decision on November 21, 2014. [AR 479-494]

## LEGAL STANDARDS

### I.     SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137,

140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

**II.      Standard of Review**

This Court's review is limited to whether the final decision is supported by substantial

evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ ruled that Plaintiff engaged in substantial gainful activity from January 1, 2013 through June 30, 2013, but there had been a continuous 12-month period during which the Plaintiff did not engage in substantial gainful activity (Step One). [AR 485] Further, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; glaucoma; history of fractures of the right lower extremity, status post internal fixation; and major depressive disorder (Step Two). [AR 485] The ALJ found Plaintiff's hearing loss to be "not severe,"

saying "[h]is examining and treating physicians have noted no significant difficulties talking with and understanding the claimant in normal conditions." [AR 486] Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [*Id.*]

The ALJ then determined that Plaintiff had the RFC to perform "sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can occasionally squat, kneel, and crawl; cannot climb ladders or scaffolds; cannot operate foot or leg controls; can perform frequent, but not constant, visual acuity, and cannot perform complex tasks, such that he is limited to work with an SVP of 2 or less." [AR 487-488] The ALJ determined that the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [AR 488]

The ALJ went on to determine that Plaintiff had no past relevant work (Step Four), and that considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform jobs existing in significant numbers in the national economy (Step 5). [AR 493-494] As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 494]

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ failed to address the Plaintiff's severe auditory impairment; (2) the ALJ failed to apply the correct legal standard when evaluating

the medical evidence; and (3) the ALJ's evaluation of Plaintiff's 2013 earnings was based on a wrong legal standard and not supported by substantial evidence.

## ANALYSIS

The Court will address each of Plaintiff's issues in turn.

### I.   Whether ALJ Erred in Finding Plaintiff's Hearing Loss "Not Severe" at Step 2

Plaintiff contends that the ALJ erred in failing to list his hearing loss as a severe medical impairment at Step 2 and in "fail[ing] to even mention [Plaintiff's] hearing impairment in his most recent decision." Opening Brief, docket #14 at 18. Plaintiff asserts that one of the issues on which the case was remanded was further consideration and evaluation of the Plaintiff's impairments at Step 2, including hearing loss, but the ALJ failed in this respect. Defendant counters that it matters not whether the ALJ considered the impairment at Step 2 because he proceeded and considered Plaintiff's hearing loss when fashioning the RFC.

Pursuant to 20 C.F.R. § 404.1520(a)(4)(ii), at the second step of the sequential evaluation process, an ALJ is required to determine whether a medically determinable impairment may be classified as severe and whether such impairment meets the duration requirement of 42 U.S.C. § 423(d)(1)(A), which provides:

> (1) The term "disability" means--
>
> (A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.
>
> "A physical or mental impairment must be established by medical evidence consisting of

signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508. Section 404.1508 provides that a claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." More specifically, "symptoms" are the claimant's description of his/her own physical or mental impairments; "signs" are anatomical, physiological, or psychological abnormalities that can be observed apart from symptom descriptions and must be shown by medically acceptable clinical diagnostic techniques; and "laboratory findings" are anatomical, physiological or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques. 20 C.F.R. § 404.1528.

An ALJ's omission of an impairment altogether could be reversible error. "It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less. ... Further, the failure to consider all of the impairments is reversible error." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (citations omitted); *see also Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

In this case, the ALJ did not omit consideration of the Plaintiff's hearing loss altogether; rather, he acknowledged Plaintiff's hearing loss at Step 2 and determined it to be "not severe." [AR 486] Defendant cites the Tenth Circuit's opinion in *Carpenter v. Astrue* for the proposition that, even if the ALJ errs in finding an impairment not to be severe at Step 2, such error is harmless if the

ALJ proceeds to the remaining steps of the evaluation and considers both severe and non-severe impairments in fashioning the RFC. The Court agrees. "An error at step two of the sequential evaluation concerning one impairment is usually harmless when the ALJ, as occurred here, finds another impairment is severe and proceeds to the remaining steps of the evaluation." *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)). In addition, the Court agrees that the ALJ here properly considered the Plaintiff's hearing loss during required steps of the evaluation and in formulating the RFC. The ALJ noted Plaintiff's testimony that "he cannot hear in his right ear." [AR 488] Moreover, during the hearing, the Plaintiff never indicated any trouble hearing proceedings and there is nothing in the medical record indicating problems between the Plaintiff and his health care providers in communicating because of Plaintiff's hearing loss. Notably, the Plaintiff does not argue that the RFC is deficient and/or should contain identified limitations due to his hearing loss.

Accordingly, the Court finds that any error by the ALJ in finding Plaintiff's hearing loss "not severe" at Step 2 was harmless. The Court affirms the ALJ's decision on this issue.

**II.     Whether ALJ Failed to Apply Correct Legal Standard in Evaluating Medical Evidence**

Plaintiff contends the ALJ improperly accorded "moderate" weight to nearly all of the medical opinions and failed to apply the six factors necessary to consider each opinion; as such, the Plaintiff argues the ALJ's decision is impossible to review, particularly his findings regarding Dr. Hayes and Dr. Frommelt. Defendant counters that the ALJ "drew a reasonable path between the conflicting physician opinions when determining Plaintiff's residual functional capacity," and properly considered and incorporated Dr. Hayes' and Dr. Frommelt's opinions into the RFC.

15

An ALJ must consider the following factors in determining how to evaluate medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)). "An ALJ may dismiss or discount an opinion from a medical source only if his [or her] decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if he [or she] provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)). "However, an ALJ need not 'apply expressly each of the six relevant factors in deciding what weight to give a medical opinion,' so long as he provides 'good reasons in his decision' for the weight accorded to each opinion." *Thielemier v. Colvin*, No. 12-cv-03178-PAB, 2014 WL 1292885, at *3 (D. Colo. Mar. 31, 2014) (quoting *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)). In addition, "[a]n ALJ's rejection of a medical opinion based on an incorrect reading of the record is grounds for remand." *Sedlak*, 2014 WL 717914, at *10 (citing *Mercer v. Colvin*, No. 12-CV-35-FHM, 2013 WL 785358, at *2 (N.D. Okla. Mar. 1, 2013)).

The ALJ found the following regarding the opinion of Harrison Hayes, M.D., an ophthalmologist:

> On May 13, 2011, Harrison Hayes, M.D. reviewed the file and opined that the claimant should avoid hazardous work or d[r]iving due to his visual impairment. The undersigned gives this opinion moderate weight. The opinion was rendered after a thorough review of the medical file. The opinion is not entirely consistent with the claimant's admitted activities of daily living, as the claimant testified that he can see well enough to drive. Therefore, limitations on driving are not supported by the record. Furthermore, the limitation on working in hazardous areas is somewhat

>  vague, but the undersigned has incorporated limits on working on ladders and scaffolds to account for some dangerous work situations. However, the claimant is able to see well enough to avoid hazards such as moving machinery. Therefore, the undersigned gives this opinion moderate weight.

[AR 491 (citations omitted)] Dr. Hayes found Plaintiff's field of vision "limited" in that the "visual fields are constricted bilaterally." [AR 509] The narrative portion of Dr. Hayes' opinion states, "No driving. No work with dangerous machinery," and under "Hazards (machinery, heights, etc.)," the doctor noted "avoid concentrated exposure." [*Id.*] The Court finds the ALJ gave good reasons for assigning moderate weight to Dr. Hayes' opinion – that is, the ALJ accepted the portion that was consistent with the record (due to Plaintiff's limited field of vision, the ALJ imposed limitations from climbing ladders and scaffolds) and rejected the portion that was inconsistent (Plaintiff testified during the hearing that he could see well enough to drive during the day). Accordingly, the ALJ applied the correct legal standard to this opinion.

> Likewise, the ALJ properly considered the opinion of Gayle Frommelt, PhD:
>
> On May 17, 2011, State agency psychologist Gayle Frommelt, PhD, reviewed the file and opined that the claimant could perform work that could be learned in up to 3 months' time. This opinion is given moderate weight. It was rendered after a thorough review of the record, and is consistent with the record as it existed at the time of Dr. Frommelt's review. Furthermore, State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of medical issues in disability claims under the Act. However, more recent evidence persuades the undersigned that the claimant is more limited than opined to by Dr. Frommelt, and therefore, the undersigned gives this opinion only moderate weight.

[AR 492 (citations omitted)] Plaintiff contends the ALJ did not properly consider Dr. Frommelt's findings that Plaintiff was moderately limited in "get[ting] along with coworkers and peers" and "respond[ing] appropriately to changes in the work setting." Opening Brief, docket #14 at 21.

However, Dr. Frommelt also found Plaintiff "can manage [on-the-job] social interactions" and was "likely to do better with routin[e] tasks." [AR 513] During the hearing, the vocational expert testified the jobs that could be performed under the ALJ's hypothetical RFC included "simple" tasks: "[o]nce trained, they don't need a whole lot of instructions after that." [AR 710-711] Thus, the Court concludes the record supports the ALJ's finding that Dr. Frommelt's opinion should be accorded moderate weight – the ALJ accepted the portion that was supported by the record (Plaintiff is limited to routine, simple tasks) and rejected the portion not supported by the record (Plaintiff is limited to an SVP of 2, which means the Plaintiff can perform jobs requiring only a short demonstration to learn the position, up to one month, as opposed to the three months found by Dr. Frommelt).

In sum, the Court finds the ALJ properly weighed the medical evidence by giving good reasons for the weight he accorded the physician's opinions. *See Oldham*, 509 F.3d at 1258.

## III.    Whether ALJ Based Evaluation of Plaintiff's 2013 Earnings on Wrong Legal Standard

Plaintiff contends that the ALJ should have found the Plaintiff's work in the first and second quarters of 2013 was an "unsuccessful work attempt" rather than "substantial gainful activity" at Step 1 of the evaluation. He concedes, "the ALJ correctly found that [Plaintiff's] earnings for both quarters [in 2013] averaged out to over substantial gainful activity (SGA) for each month." Opening Brief, docket #14 at 22.

Under the applicable regulation, the SSA instructs claimants that an unsuccessful work attempt occurs if "after working for a period of 6 months or less, your impairment forced you to stop working or to reduce the amount of work you do so that your earnings from such work fall below the substantial gainful activity earnings level in paragraph (b)(2) of this section, and you meet the

18

conditions described in paragraphs (c)(2), (3), (4), and (5), of this section. 20 C.F.R. § 404.1574(c)(1). Specific to these circumstances, paragraph (c)(2) provides "We will consider your prior work to be 'discontinued' for a significant period if you were out of work at least 30 consecutive days. ... [or] if, because of your impairment, you were forced to change to another type of work or another employer." In addition, paragraph (c)(4) provides:

> If you worked between 3 and 6 months. We will consider work that lasted longer than 3 months to be an unsuccessful work attempt if it ended, or was reduced below substantial gainful activity earnings level, within 6 months because of your impairment or because of the removal of special conditions which took into account your impairment and permitted you to work and –
>
> (i) You were frequently absent from work because of your impairment;
>
> (ii) Your work was unsatisfactory because of your impairment;
>
> (iii) You worked during a period of temporary remission of your impairment; or
>
> (iv) You worked under special conditions that were essential to your performance and these conditions were removed.

20 C.F.R. § 404.1574(c)(4). Importantly, Plaintiff mentions nothing about whether he was out of work for 30 days, assigned to another type of work, or experienced any of the other situations mentioned in paragraph (c)(4) within the six-month time period.

Nevertheless, the ALJ determined there was subsequently "a continuous 12-month period during which the claimant did not engage in substantial gainful activity" and proceeded to evaluate whether Plaintiff was disabled; because the Court has concluded the ALJ properly determined the Plaintiff was not disabled at Step 5, Plaintiff's argument challenging the ALJ's Step 1 finding here would be rendered moot.

## **CONCLUSION**

In sum, the Court concludes that the ALJ engaged in proper evaluations at Steps 1 and 2, and applied the correct legal standards when evaluating the medical evidence. Therefore, the decision of the ALJ that Plaintiff Vincent Abeyta was not disabled is **AFFIRMED**.

Dated at Denver, Colorado this 25th day of August, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge